Unless there's something, unless you say otherwise, I'll move on. You want, right, good? And if we can have both counsel for the next case, please both unmute and show your video. Thank you so much. Ms. Napora. Good morning. Good morning. May it please the court, my name is Chandra Napora, and I represent the relator in this false claims act case. And in our view, of course, when all allegations are accepted as true and all reasonable inferences are drawn in the relator's favor, as needs to happen at this stage, the particularized allegations that we've set forth put each defendant on notice that the defense needed a trial. The complaint should have survived the motion. We therefore seek reversal of the district court's grant of the motion to dismiss. And in the alternative, because amendments should be freely given, and this case is in its early stages of litigation, no undue prejudice would obtain. A proper application of the court's rule 15 standards compels reversal of the district court's decision on our motion to amend. And we would seek reversal there as well. I want to cut right to 9b, as I imagine that's the most fruitful discussion. And just last year in Wheeler, this court underscored there are two paths an FCA relator, a false claims act relator, can take to satisfy rule 9b. The first, of course, is to detail the who, what, when details of specific allegedly false claims submitted. And this, of course, is to foreclose the possibility, for example, that a claim was written off instead of submitted as this court recognized in grant. So just to be clear, while the court in Wheeler last year highlighted that there are these two paths, one, of course, detailing a specific false claim, and the other, setting forth the allegations of a reliable indicia that necessarily leads to the plausible inference, false claims are submitted. It's not a new standard articulated by the court in Wheeler. This has been the state of affairs in this circuit and in every other circuit. There's not a single circuit in the country that requires a staple of the claim to the complaint. But here, the complaint walks both paths. And in the first, of course, the complaint, the admitted complaint contains attachments of actual paid claim lines for claims where the underlying transactions violated the start law and or the AKS. And, of course, the violations of the Stark law and the AKS that are detailed in the complaint provide the falsity element of the False Claims Act. And the claim submitted, the paid claim lines attached in the appendices dispel any doubt that the claim was written off instead of submitted. Can I ask you to explain this? Because at no point have I figured out from your complaints or anything else what this is. On JA-144, can you just take the first line and walk me across what these things are to help me understand how this relates to an alleged false claim? Sure. The far left column is about de-identification. So that doesn't matter. The second line, the second column, that's who the billing entity is? Right. That's the billing. Yes, Your Honor. That would be the provider. So in this case, the THSPP. So that's the billing entity. Right. I'm so sorry. And then the third one, Dr. Chapman, he's a THSPP doctor. He is paid part of his compensation. He's on paper employed by THSPP. Part of his compensation comes from the hospitals. But he is a physician who, the complaint contains allegations regarding his improper compensation arrangement with the hospitals and APS allegations. I'm trying to read the chart. You can make the argument when we finish the chart, but how about help me read the chart rather than make the argument? All right. So the next one is also a doctor, as you've just described in detail, similarly situated, John Manning. Is that correct? Yes. He appears to be the referring provider referred to Dr. Chapman. And I can speak more on this. I just want to understand the chart. I'm sorry, what? The place that it's done, is it THS Physicians Partner? That's the same thing as THSPP, right? Right. Okay. And then the next is the date, right? So that's easy. The CL procedure code 5200 or 52,000, excuse me, is a particular procedure. This one's an endoscopy, but it doesn't matter what it is. And then the amount paid and the date the claim was submitted and the date it was paid. Right. Okay. So just to put your allegations in context for me, for this claim that's identified, tell me where the hospital is involved. Why is this on the list? Because I'm not understanding where the hospital is involved. What am I missing? Well, two things. One, we allege both Stark-related claims, which, of course, Stark prohibits the submission of claims by the hospital for services referred by the incentivized physician. So this would not be relevant to the Stark claim because there's no allegation on line one that the hospital submitted any claim or made any claim with respect to this service. So with respect to this particular service from this information that is provided here, we do not see that this service was provided at a hospital, and therefore we would consider this to be an example of a paid claim relating to our AKS allegations, which are not dependent on HRSA. So maybe then help me a little bit. How am I supposed to understand all of this? I mean, maybe that makes sense. I'll have to go back to that. How am I supposed to understand any of this from the complaint as to who's the defendant and what they're doing? I mean, I'm just having a little hard time deciphering. Okay, that lines to the AKS claim. Maybe you think the five lines down, it's related to the Stark claim. This just seems like a mash of information. It's like a data dump. It's not a claim that's articulated with particularity. Help me just with respect to the appendix. I understand you maybe provide some context from the complaint, but these claims don't seem to do anything for me. I guess I'm just confused, perhaps. So I think your question is, like, how is the court supposed to know how to read the appendices? Okay. And I think respectfully, the question is, for 9b purposes, right, how are the defendants supposed to know so that they can prepare defense? I agree. They're a lot smarter than I am, but, you know, we're judges, and so we sort of have to evaluate that question.  And the claims data that's provided here speaks to the who. For example, you've got the physicians that we've discussed in the complaint. And, again, for a complaint, for a 9b analysis, the complaint has to be read as a whole, right? So the appendices in a vacuum are claim lines. But if you tie them to the allegations of falsity in the complaint, then you've got the who, which is the incentivized physicians. You've got the what, which are the CPT codes in that. You've got the when, which are the dates of service. You've got the amount paid, which, by the way, isn't necessary, right, because, of course, in the False Claims Act context, the violation occurs when the claim is submitted, whether there's anything actually paid or not. And then you've got the where, meaning either in the physician's office, as you noted with Dr. Chapman there, or certainly if we go down the line, there are multiple examples that we can go down to. The next one down on the Thomas Hospital, that occurred at a hospital, right? So that claim would, because we know that it occurred at the hospital, is necessarily going to implicate a hospital claim. And, by the way, the defendants do not dispute in any way, at any point, that the hospital submitted claims for DHS services provided by these physicians. And they could not legitimately make that claim because their entire compensation structure is premised on the hospital generating revenue from the physician's referrals. And so there's no dispute. So whether we can assess claim by claim by claim, could we provide, I was thinking about this, like how to provide the clarity that seems to be eluding the district court and possibly this court in an amendment. And so would it be charts? Would it be like this doctor, this claim, this possibly? But I keep coming back to- I totally get that I can't figure out how to provide clarity either. But when you talk about the amendment, like you're sort of saying it's impossible for you to figure out what the amendment would look like. How is the district court supposed to figure out what the amendment would look like when you didn't file a proposed amended complaint? Like you wanted it to address the amendment issue without telling what you've currently described as like an impossible answer? Oh, please allow me to clarify. Sorry to interrupt. I don't see it as impossible at all. In fact, I think that what we have provided in both- I mean, we presented- First of all, there's no requirement that we provide every detail under the sun to satisfy 9B. And we just- I cannot understand how- When you look at this court's jurisprudence in 9B, I cannot understand how when we've satisfied the concern and grant that a claim was actually submitted and we have provided reliable indicia such that the only reasonable inference is that false claims were submitted. How could a finding that this complaint with that level of detail, with the defendant's own documents, with emails, with board meeting minutes, with contribution management reports, where they are expressly and clearly tracking the referrals- the value of the referrals from these physicians to those hospitals and they are subsidizing- they're paying these physicians above fair market value and offsetting that with the hospital revenue. I just struggle to understand how the court could find in Wheeler that the complaint there satisfied 9B. But here, it would not. So when I talk- When I say I've been trying to figure out how to convey- to answer the district court's confusion, when certainly I don't find it impossible at all, what I do find it is a standard that is required not even at trial. So it would be the creation of demonstratives or summary exhibits or a closing argument, that kind of chart that we would use at trial. Here, it's a pleading standard. Could those charts provide clarity? Probably. Are they required by this court's jurisprudence? No. There's just- It cannot be squared. In fact, if this court- If we were to- If this complaint with actual paid claims data and coupled with detailed information from the defendant's own mouths, if that can't satisfy either route, then it seems to me it becomes incredibly difficult to draft any kind of false claims, that complaint that would satisfy either route. Because what we- As folks who draft these complaints all the time, what we hear from the courts are, you've got to give us- You've got to show us that a claim was submitted. Not that it was paid with cash, not that it was written off, not that they decided at the last minute not to bill the government. Or- And you can do that either by showing us specific false claims or you can show us by alleging, and I can refer the court to the Bookwalter opinion in the Third Circuit, which really kind of laid out this- This is not about a claim-by-claim-by-claim-by-claim requirement. Instead, it's sufficient allegations of pattern of conduct that renders these claims false with reliable indication that claims were actually submitted. And that's the court standard articulated. I see I'm running out over my initial time. The standard that the court articulated in Grant, in Nathan, in Nicholson, in Wheeler, and by the way, I just want to say this, for four purposes of 9b, and again, I refer the court to the Escobar decision of the Supreme Court that helps make the connection, if it's still elusive, to the information contained on the claims data, which is, again, these appendices, provide the who, what, where, when, and how of the claims. The billing codes and the information provided in those claim lines was enough in Escobar. It should be enough under this court's 9b precedence, and we believe it's enough here. I can't- Definitely, just one question I have for you is that, are you saying that if a physician, I guess I'm a dinosaur in terms of all this language, but what we would call basically a doctor who sort of has privileges in a hospital, as it's called. So if the doctor only has one hospital where she has privileges and therefore refers all of her work to be done, procedures at that hospital, and their bills are submitted by the hospital, are you saying that would be a start? That's because they have a relationship with that hospital? No, no. We are not arguing, and the complaint does not allege, that an employment relationship, just as a sort of generically violates the Stark Law. Certainly not. That may not be employment. The doctor has her own group where she's employed, and the referral is through privileges. So again, that's outside the context. So you're saying that could be a Stark claim, right? No, no. I'm sorry, I misunderstood. So you're talking about a situation which is not present here in this complaint, because we're of course going to run change. I'm trying to understand what a Stark claim is, because you're saying they're incentivized. That's to ask only because they're incentivized, meaning if they can come over the quota or the minimum they get, or just if they meet the minimum and never get incentivized, is that a Stark violation too? So Stark is violated where the physician is in a position to financially benefit from referrals made to the hospital. So that can happen either with like a direct compensation. It can happen with lease agreements. It can happen with ownership interests. But here we're alleging it happens because there's a direct compensation arrangement between the – which, by the way, the defendants did not dispute – between the hospitals which fund the physician's bonuses, which are based on productivity, which they get credit for other people's work. So it incentivizes when the incentivizing comes in. It incentivizes – basically the more RVUs they generate, the more money they make. How do they generate those RVUs? So it's by getting credit for other people's work, et cetera. And it results in above fair market value compensation for many of them. And so there's this compensation relationship where the physicians financially benefit from the revenue of the hospitals, that they generate for the hospitals. Now that's where the Stark issue comes in. So in a situation, as Your Honor's describing, where you don't have that – you're not in a situation where the physician who is not in a position to financially benefit from the referrals they make to the hospital, then Stark is not implicated. And that's not the world we allege here. All right. Thank you. All right. Go ahead to Mr. Honey. May it please the court and counsel. First, I'd like to thank the court for doing these remotely. I know it's less than optimal, but had it not, I would probably be sitting in an airport somewhere between Chicago and the East Coast, frantic and nervous and helpless. So I thank you for that. I'd like to start with Rule 9b. There is no question this complaint failed to meet the requirements of Rule 9b. It lumped defendants together repeatedly without identifying what any defendant did. Appellant relies upon case law that says the word defendants is not fatal, but that case law goes on to say it is not fatal, where all of the defendants are alleged to have done the same thing. All of the defendants are not alleged to have done the same thing in this case. Doctors are alleged to have made referrals. Mr. Ullery is alleged to have created a scheme. Hospitals are alleged to have billed for referrals, and the hospital system is alleged to have been a paymaster. They are not all alleged to have done the same thing. Therefore, the failure to differentiate is, from the start, fatal to the Rule 9b. Couldn't you just tell us what everyone's alleged to have done separately? You just told us that Mr. Ullery is alleged to do one thing, hospitals something different, the paymaster something different, and that's in the complaint. All of these individual, they're not lumped together for those claims, so how is that not specific enough? So when you get to the specificity required under Rule 9b, who did what? It is not identified who did what. It is not identified when they did it. It is not identified what they did. It is only discussed in gross generalities. Well, it's not only discussed in gross generalities. I mean, the district court pointed to a few paragraphs where they refer to defendants as some or all of the defendants in a way that might be confusing, but there's many, many more paragraphs that refer to each of the defendants individually. They quote the individual defendant. There are dates when these things happened. There's meetings when they happened. There's, you know, we can all tell what the alleged scheme is and who's doing what. I don't follow the argument that because they refer to defendants in gross a couple times that now we can't understand what's going on. Thank you, Judge Rushing. They do refer to the defendants as gross most of the time, but when you get to the Rule 9b requirements, the submission of a claim, who submitted a claim? Who submitted a claim which was false? Isn't that the charts? I mean, didn't we just go over the charts? Who submitted the claim is the billing provider. Isn't that who submitted the claim? The charts, thank you, Judge, that was my next point, and the answer to your question about the charts is found on page 31 of appellant's brief in which they confess that the charts do not identify a I'll go through the charts, as Judge Richardson asked. Why is that a particularity problem? Isn't that the whole argument here, particularity? Yes, yes. If there is no claim submitted by a hospital, there's no Stark violation and there's no anti-kickback violation. The relator, the appellant in this case, is asking us to assume that a claim because the hospital's not alleged to have done anything that violates the law, but that's different than an argument that it's not stated with particularity, right, just so we're clear. It is both, and it is a failure to plead what the hospitals or the defendants did with any particularity, and if they can't allege a claim by a hospital, then they can't allege a violation by the physicians because there's no Stark violation. They can't allege an anti-kickback violation. The relators admit that those charts don't include a single claim submitted by a hospital. And to try and get around that, what they're trying to do is expand the plausible inference language in Wheeler to say that you can plead 9B by plausible inferences in their entirety, thus consuming Rule 9B. Wheeler was a very limited decision. Wheeler said, if a plaintiff in a fraud case pleads the underlying fraud with particularity, step one, and that that necessarily leads to the plausible inference that they submitted a claim to the government, a whistleblower who doesn't have access to the claim submitted to the government does not need to produce. In this case, though, they would ask to expand Wheeler to say, if we can plead the underlying fraud by plausible inference, that might lead to one of many plausible inferences that a claim was submitted to the government, then we've met the requirements of Rule 9B. If Wheeler is expanded to that extent, Rule 9B ceases to exist, and it can't be expanded to that extent because it's limited by Ashcroft v. Iqbal, which states that where the well-pleaded facts do not permit the possibility of misconduct, the complaint is alleged, but it is not shown that the pleader is entitled to relief. So, going to specific types of examples. First of all, there's a question whether these exhibits should even be considered by the courts. Exhibits attached to a complaint should be considered where they're integral and explicitly referenced in the complaint. These are only generally referenced in the complaint. The entire discussion of the appendices says Appendix A shows the claims to Medicare. Appendix B shows the claims to Medicaid. Appendix C shows the claims to TRICARE. So, should they be considered? Probably not. Even if they are, what do they show? Appendix C doesn't even name a hospital. It doesn't show any claims by a defendant hospital. Appendix B doesn't name a hospital either. It says outpatient hospital or inpatient hospital, but doesn't name a hospital. Appendix A names some defendant hospitals, some non-defendant hospitals, visits to offices, visits at home, visits to long-term care facilities, but not... But here's what it doesn't show. Claims by hospitals. Here's the plausible inference that they want you to reach to plead fraud with particularity, which is not what Wheeler says. And that is, if a patient gets service at a hospital by a doctor, they must have been referred by the doctor. Is that necessarily the plausible inference from these exhibits? Only if hospitals don't have emergency rooms or walk-in clinics. It is equally plausible that a patient seen at a hospital referred themselves. So, from the get-go, from the starting point, they are asking the court to make assumptions, calling them plausible inferences, and letting the plausible inference language from Wheeler do all of the lifting instead of just the element of proving a claim submitted to the government. So, the appendices don't get them there at all, because, by their own confession, they don't include hospital services or a referral to a hospital at all. Absent a referral to a hospital, there's no stark violation, there's no kickback violation. Now, there are lots of other assumptions that the appellant would have the court make, and they start with one which could not possibly be admissible. It starts with, Mr. Ullery worked at a hospital in Florida that settled a false claims act case with no admission of wrongdoing. And he brought that fraudulent scheme with him to West Virginia. Now, that's not a factual statement. That is an assumption that the hospital in Florida did something wrong. It's an assumption that Mr. Ullery was involved in the wrongdoing, and it's an assumption that Mr. Ullery brought that wrongdoing with him to West Virginia. None of those things are facts. The next assumption that they would call a plausible inference and have do all the lifting, which Wheeler doesn't say, nor could it, is that there was a referral made every time somebody was at a hospital. And we know that that's not true, because people go to hospitals when they're referred by a physician, when they're referred by a physician who's not part of Thomas Health, when they come to a walk-in clinic, or when they come to an emergency department. So we can't assume a referral. They want you to assume a referral by saying a doctor provided a service at a hospital. They also want you to assume that a hospital billed for a service just because a doctor performed a service at a hospital. So now we're breaking up the professional component of billing with the technical component of billing. But nowhere in here, even in their appendices, have they said, for example, that CPT code 99214, that's the fourth line in Appendix A, necessarily includes a technical component. Nor does it, because 99214 is the CPT code for an established patient office visit at a moderate level of care. They've not even included in their exhibits what necessary technical component would be included. So they want you to assume that. Then they want you to assume that the hospital submitted a claim, though they've not shown a claim that could be submitted by the hospital, and that it was paid. And then finally, they want you to assume that the hospital payments, which went to support the physician practice, were kickbacks based on the volume or value of services, even though in their complaint, they admit that those payments were made based on a formula that did not include the volume or value of services. But why, they say, would the hospital or the system supplement this physician practice, but for kickbacks? Because they wanted to keep OBs on staff and not turn Charleston, West Virginia, into yet another maternity desert? Because they wanted to keep a pediatric oncologist on staff, even though they don't generate enough money to keep them on staff independently? There are lots of reasons hospitals subsidize physicians, and the fact that they admit they were paid based on a formula, not based on the volume or value of referrals, is evidence they pled themselves out of their lawsuit. But wait, they say, these doctors were paid above fair market value. And how do we know that? Because they were paid within the range of fair market value. But some of them were paid at the high end of the range. So their argument is we've shown that they were paid above fair market value by showing that they were paid within the range of fair market value. The government itself has rejected that assumption as we wrote in our brief. They also say, but wait, the doctors were paid on a WRVU basis, meaning the more they did, the more they got paid. And we respond, right. That's how it's supposed to be. In fact, Medicare said when doctors are paid on a per unit basis, and they are not paid above fair market value, it is by definition not a payment based upon the volume or value of referrals. Can you respond to the argument that they also included NPPs that were, they say in 158, some of whom were employed by the hospital? Because obviously if they're employed by the doctor's office, it doesn't matter. But can you address this allegation that their payment includes sort of conclusory as some NPPs who are hospital employees. They later talk about NPPs that are not hospital employees, but there's this general allegation in 158. Can you address that? Absolutely, in three different ways. First, there's not a single reference to a claim that relates to an NPP anywhere in the exhibits as far as we can tell. So that fails under Rule 9b. Now going to Rule 12b-6, it's legally wrong. Doctors bill for services provided by NPPs under a concept called incident to billing. And I can give that to you in a very simple example. A patient comes to see a doctor, whether they're at a hospital and they see a hospital NPP, or at their office and they see an office NP. The doctor says, you have a bad infection I can't treat with oral antibiotics. So you need to come in every day for the next five days and get an injection of Wampasilla. The patient says, great, I'll be back tomorrow. The patient comes back the next five days and gets injected by the nurse practitioner. How is that properly billed? It is properly billed by the physician because the NP is providing services, and this is the legal phrase, incident to the physician's advice. So what's happening is yes, the NP is doing the injection and the doctor is billing for it because the NP is carrying out the doctor's services incident to the physician's services. That is how NP billing is done. Additionally, they have another claim, that these doctors were paid for Can I go back to that? Fine, but I take your colleague's response to that at least in part to say well, if the NP is employed by the hospital and the doctor gets the benefit of that incident to billing, that's a stark violation. I think she would say that is itself a stark violation. What's the response to that? It would be incorrect. Why? Because in all incident to billing what the doctor is billing for is his or her medical decision making and advice. And whoever follows through on it is performing services incident to that physician's services. It doesn't matter where the NP is. The billing rule is if the services are being provided incident to the billing entity is the physician who gave the advice and services. It doesn't matter where they are. That's not a stark violation because all the services are still being provided as simply a follow-up to the physician's own services. And nowhere in their complaint or in their briefs did they attempt to explain how that would be a stark violation, nor could they, because it is not. Additionally, physicians can be paid for supervision of NPs. And in fact, mid-levels in West Virginia are required by law to have a supervising physician. And physicians get paid for the services in their office as physicians. But remember, the money that they've included in their calculation of fair market value doesn't just include salaries. It also includes money physicians get paid for, and completely appropriately, for being the chief surgical resident or the chief of obstetrics at the hospital. And so they can get paid for supervising without it being a violation as long as they're getting paid as part of a written contract. I'm down to under four minutes, so I want to get to the futility just really quickly, as fast as I can. First, there's no Second Amendment complaint. Even now when it's being reviewed de novo, appellant has not given the court a Second Amendment complaint to consider futility. But even if it did, it couldn't get there because their entire complaint is based on legal fallacies. Fair market value, which we've discussed, is still fair market value. WRVU payment is still WRVU payment. Now they may say, but what about TUMI? What about TUMI, which found that they weren't paid fair market value and that's enough? TUMI's different. The key fact in TUMI was that the hospital went lawyer shopping, getting opinion after opinion after opinion, many of which said this isn't fair market value until they found one that said it is. And that was evidence that they had knowledge payment wasn't fair market value, and that does not exist here. They've made no allegation of a meeting of minds for conspiracy. Reverse false claims cannot be a bootstrap to your underlying claims. They have to address something else. I've already addressed the NPs in Incident 2, and then finally we'll get to the kickback statute. The circuits that have addressed this, most of the circuits that have addressed this have said to identify and plead a kickback, you must allege but-for causation. That but-for the kickbacks that they were receiving, the physicians would not have made a referral. There is no but-for causation here. There is no allegation of it. All they allege is that the physician's practice was subsidized by the hospital based on a formula that had nothing to do with the volume or value of referrals, but had to do with the costs and expenses. A perfectly reasonable and plausible inference, equally plausible inference, is that was done to keep physicians necessary on staff versus there being kickbacks. So, I don't believe the appendices should even be considered. If they're considered, the appellant has admitted they don't show any claims by hospitals, and claims by hospitals are absolutely essential for both their stark and their kickback allegations. You cannot expand Wheeler to strike the words necessary and thee, nor can you expand Wheeler to meet every single element of Rule 9b pleading, because remember, it said if you've pled your underlying scheme with particularity and the only reasonable conclusion is that a claim was submitted, then you don't have to show claims. In Wheeler, there was a smoking gun. Therapy records were falsified and the court said what reason is there for falsifying therapy records, but to support a claim to the government? Therefore, there is necessarily the plausible inference claims were submitted to the government. What we have here is not a smoking gun, but steaming innuendo. The doctors must have made referrals to the hospital because they perform services at the hospital, although we know that that's not true. The hospital must have had some kind of claim they could have billed, in addition some technical complaint, though we've not shown it. And therefore, the hospital must have submitted a claim, though we don't know if they even had one they could submit. And all of this was a kickback because maybe the subsidies to the hospital were based on the volume of value referrals, even though we know they were not. This is a general scheme based on a fallacy that starts with Mr. Ullery in South Florida and leads to us here today. I thank your honors. Thank you, Mr. Honaker. Ms. Napora, you have time reserved. Thank you. Can you start with this idea of the WRVU incident billing, that if that is done by a doctor, so a doctor goes over to the hospital and directs the shots that your friend indicated and the doctor bills that NPP time as incident to their billing code, is that itself a stark violation and is that what you're alleging? We are not, the complaint purposely does not speak to incident two and respectfully... Yeah, I know you're trying to avoid it, but what I'm saying is... No, no, no. I'm actually not trying to avoid it. Sorry, we're talking over each other. Not trying to avoid it at all, it's just not relevant here. It's not relevant here because when you look at a... Stark requires, in order to... First, I guess let me contextualize by saying all of what the defense counsel is referring to to the extent that it's grounded in the complaint or the law, and I can come back to those in particular, speaks to affirmative defenses, which they have the burden on, and so if they want to come back and say, look, in fact the services that the physicians were given credit for in the WRVU assessment which again goes to their compensation, they get bonus based on their productivity, their productivity is assessed by the productivity of others and so it's not personally performed services which it must be to qualify for Stark exceptions, right? But the Stark exceptions, again, are their burden once we make the prima facie case. But your responsibility is to make with particularity a plausible allegation that on this particular issue that their compensation for WRVUs from NPPs are somehow illicit referral payments and not permissible supervision or incident of billing. I mean, that seems like the sort of Twombly idea, right? It could be that this is illegal antitrust conduct or it could be just sort of standard action and what I can't tell from the complaint is why I picked between one or the other. So let me speak for a little bit on WRVUs because I just think there's some confusion here. As the complaint alleges, and I can JA 92 paragraph 18 the physician compensation plans at issue here included a base salary, and again, we're only in Stark world right now, and I just want to flag for the court that many of defense counsel's references to the AKS represents sort of a blurring of the two statutes. The question for the court on the AKS is whether the complaint alleged that at least one purpose of the remuneration provided was to induce referrals. It has nothing to do with the volume of value of referrals. That's a Stark analysis and I just need to highlight that so that confusion that the defense has interjected gets cleared up. But back to Stark. The physician compensation plans at issue included a base salary and incentive compensation, right? They're both tied to WRVU numbers. The physicians were required to generate a minimum number of RVUs, which are specifically identified in each contract per year in order to earn their base compensation. And then their incentive compensation was calculated by applying a set dollar amount, which is the conversion rate, which you see referenced throughout the complaint per WRVU generated in excess of the base. And so how does that go to... Can I pause for a second just so I understand what your story is? But you agree if the only WRVUs that were included were the physician's own time-treating patients, that that would be perfectly acceptable. That's not a Stark problem at all. With the caveat that if the conversion rate was not sort of, as we allege that it is here, the conversion rate were not sort of disguised to artificially inflate the compensation. And this goes to this issue of whether the hospitals are subsidizing the physician salaries in exchange for referrals, which they are. And how do we know? Because, for example, the Medicare conversion rate per RVU hovers around about $35. The defendants know this. They know all of this. They track all of it. So here you have physicians who, for example, Dr. Joe Campali, who is receiving a conversion rate of over $100 per RVU. And his RVU numbers were off the charts. We're looking at WRVU numbers that suggest either borderline medically impossible days. There's no way that a physician personally could perform those numbers of RVUs. And why is that tied to the conversion rate? Because for every WRVU that he reports, not that he performs, but he reports, he gets $105 per WRVU, which is his compensation. And he's not the only one. Reaches above fair market value levels, which is, again, fair market value is not an element of Stark. It's not an element of the AKS, but it suggests, and this is clear in the case law and all the Stark false claims in the case law, that why would a hospital system pay physicians above fair market value if not to gin up their referrals? And all of the defense counsel's comments with respect to referrals respectfully are just disingenuous. They tracked, the defendants tracked minute by minute almost what the value of the referrals to the hospital, to the hospital system and the individual hospitals was by these physicians. Hiring decisions were made on this basis, not based on whether they needed someone to provide OB care in a maternity desert, but rather or in addition to, whether that physician is going to add revenue to the hospitals. How do they add revenue to hospitals and making referrals? Can I ask you to respond to one of... Counsel, Judge Rushing has a question. Yes, I'm sorry. Can I ask you to respond to one of the defendant's arguments? He said that you have admitted that nothing in the appendices shows any claims submitted by a hospital and that that is essential for a False Claims Act claim. Yes, thank you. Please respond to that before you're done. Absolutely. I love to respond to that. It's just not true. It's true that we have the claims that we set forth are not hospital claims. We didn't have access to those claims until after the district court's order and so we flagged for the district court. If that is necessary, we can provide an amendment because we now have access to those claims. We do not believe that is what 9b requires because the complaint sets forth the billing processes and again this goes back to Escobar, goes back to the pleading standards for particularity. I can refer you to the JA 76, paragraph 57, 58, 59 through 67 with detail how the interrelationship between physician claims and hospital claims. We set forth the billing processes in the complaint. The defendants certainly know what those billing processes are and so to the extent that there are claims that occurred in the physician office setting, again, we've addressed that earlier, but if we're talking about claims that were submitted where the service occurred, the word service, which is a referral under the Stark Law, and again, referral has a particular meaning under the Stark Law, not the one suggested by defense counsel, but if service is performed at the hospital, then we know and we certainly have alleged with particularity and the only reasonable inference, again, because defendants don't even dispute that the hospital submitted these claims and in fact, tracked them closely. This was the purpose of the scheme was to gin up revenue for the hospital. I'm sorry, I am trying to understand your response. There's a factual and a legal component, it seems to me, to what the defense counsel said. He said, nothing in the complaint alleges a claim submitted by a hospital. There's nothing on these charts that's a claim submitted by a hospital. That's a factual statement and that is required to state a claim. That's the legal statement. Do you disagree with one or both of those or are you admitting, yes, we don't have any claims by hospitals, but we could get some and yes, they are required? Probably the latter. So, we do not include any hospital claims in the appendices. Again, we didn't have access to those. Rule 9B does not require that we do. Does the False Claims Act require that you do? I mean, to state a violation of it. But we've alleged that they were submitted. So, the False Claims Act, sure, yes. What we allege and what the hospitals submitted false claims to the government. How were they false? Because of the violations of the Stark Law and the AKS and that Mr. Ulrey caused the submission of the false claims. So, yes, it is required under the False Claims Act and the complaint alleges that. What it does not require... Can I ask where it alleges that? Because when I read paragraph 58, which I think is what you're referring to, it says when a physician provides the care, the physician bills for it and the hospital may, not did or has to, but says they may submit a technical or facility component. Okay, well they may, but what we don't know is whether they did. I mean, that's sort of the point that we're getting out of the False Claims Act, right? We absolutely know that they did. We absolutely know that they did because the defendants complaint doesn't know that. Counsel, where am I looking in the complaint to know that? I understand that you claim to know that as we sit here today and that's helpful maybe to you but where in the complaint do I see that other... I mean, maybe it's a different paragraph, but the paragraph that I think you just pointed me to says that they may do this, which reads to me that they may not do this too. Well, okay, so fair enough.  I think that where I sit with certainty that they submitted claims comes from their own documents and particularly... Give me a paragraph in the complaint. Sure. The paragraphs that detail the contribution management reports and I can, let's see, point you to those in particular in just a moment. Well, if we look at the... I can find the contribution management reports. If that's the portion you want me to look at, I can look at that when we're done. I know we're way over. Thank you, Judge Gregory. I appreciate your indulgence. Thank you. Counselor, did you have something on the tip of your tongue? Go ahead. I have much on the tip of my tongue but I realize I'm way over time and I appreciate the court's indulgence. Thank you, counsel. Thank you both for your arguments and we, in our normal custom, we come down and greet you. Suffice it to say, a virtual one would have to do, but nonetheless, we're very thankful for your work, both of you, and be careful in this weather.
judges: Roger L. Gregory, Julius N. Richardson, Allison J. Rushing